IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

John B. Baird,            )       Civil Action No.: 6:03-3048-RBH
                       )
         Plaintiff,    )
                       )
   vs.              )
                       )     **WESTFALL CERTIFICATION**
Communication Technologies,   )         **REVIEW ORDER**
Inc., Presbyterian College,    )
Lt. Col. Jonathan M. Smith and )
David Gillespie,           )
                       )
       Defendants.    )
_____)

Pending before the court are the United States' notice to be substituted for Lieutenant Colonel James M. Smith[1] (hereinafter "LTC Smith"); as well as Plaintiff John Baird's objection to the notice of substitution by the United States (both relating to the "Westfall certification"); and Defendant Smith/United States' motion to dismiss, or in the alternative, for summary judgment.

### Background Facts and Procedural History

Plaintiff, John Baird (hereinafter "Baird") was employed by Communications Technologies, Inc. (hereinafter "Comtek"), a government contractor which provides the Reserve Officers' Training Corps (hereinafter "ROTC") with instructors to university programs across the country. Baird was assigned by Comtek as an Assistant Professor of Military Science and Recruiting Operations Officer (hereinafter "ROO") to the Scottish Highlander Battalion centered at Presbyterian College (hereinafter "PC") in Clinton, South Carolina, and which serves the campuses of PC, Lander University, and Newberry College. Baird's work as a ROO was overseen by LTC Smith. LTC Smith is an officer with the United

---

[1] Defendant James M. Smith is incorrectly identified as Jonathan M. Smith in the Complaint.

States Army and at all times relevant to this case, was assigned to serve as the Professor of Military Science (hereinafter "PMS") for the Scottish Highlander Battalion.

This case involves a female cadet recruit whose application was overseen by Baird. The cadet, a student at PC, had multiple medical conditions that disqualified her from contracting with the Army, including an eating disorder and the prescribed use of antidepressant drugs. Despite these facts, in her initial medical forms the cadet denied an eating disorder, denied use of any medications, denied depression, and denied being under medical care.

These false statements came to light on March 25, 2003, at approximately the time that Baird was activated for deployment to Iraq. An investigation was conducted by Major Dennis Wolf (hereinafter "MAJ Wolf"), the ROTC Battalion Executive Officer, in which the cadet stated that Baird had counseled her to make these admittedly false statements. Additionally, during this investigation, the cadet's mother wrote a letter telling of numerous conversations she had with Baird regarding her daughter's eating disorder and use of Zoloft for treatment of depression. The cadet's mother also noted that Baird continued to recruit the cadet and allegedly told the mother with regard to the eating disorder, "Don't worry; we'll knock it out of her after she signs." As part of this investigation, MAJ Wolf also interviewed Cathy Whitman, the ROTC Human Resource Assistant, who noted that she attempted to talk to Baird about the cadet's possible eating disorder on more than one occasion and allegedly Baird said he did not want to hear about it and didn't want to know anything. There is a factual dispute as to whether or not Plaintiff Baird admitted to LTC Smith at an April 8, 2003, meeting that he advised the cadet to make the false statements.

After the investigation, the Army concluded that Baird had engaged in improper conduct and determined that it would ask Comtek to remove Baird from his duties with the Scottish Highlander

Battalion.  The formal mechanism for this request was a May 22, 2003, memorandum authored by LTC

Smith (the "May 22 Memorandum").  The May 22 Memorandum went up the chain of command and

was approved by LTC Smith's superior and the head of the ROTC programs that included the Scottish

Highlander Battalion.  Baird was subsequently removed from his duties with the Scottish Highlander

Battalion at the request of the Army and was terminated by Comtek.

On September 24, 2003, Plaintiff Baird, through his wife and a duly executed Power of

Attorney, instituted an action against PC, Comtek, LTC Smith, and David Gillespie.  The Complaint

asserts two causes of action against LTC Smith: (1) interference with contractual relations; and (2)

defamation.  On November 19, 2003, the United States Attorney for the District of South Carolina

certified that LTC Smith was acting within his scope of his employment as an employee of the United

States at all times material to Plaintiff's action.  On November 21, 2003,  the United States filed a

"Notice of Substitution of the United States of America," in accordance with the Federal Employee

Liability Reform and Tort Compensation Act, commonly known as the "Westfall Act," 28 U.S.C.

§ 2679(d), seeking to be substituted as a party in this action for LTC Smith.  On November 24, 2003,

the Government filed a motion to dismiss, or in the alternative for summary judgment, arguing that

Plaintiff failed to follow the mandated procedures under the Federal Tort Claims Act for an action

against the United States.

On January 21, 2004, Plaintiff Baird filed a memorandum asking this court to review the U.S.

Attorney's Westfall Certification.  Baird contends that the United States Attorney's certification was

incorrect and accordingly that LTC Smith, and not the United States, is the proper party to this action.

The court conducted an initial hearing on August 26, 2004.  At the conclusion of that hearing,

the court directed the parties to conduct discovery related to the Westfall certification issue.  This

discovery was significant, involving both written discovery and eight depositions.

At the close of the discovery, all parties supplemented their earlier briefing. The court heard oral argument on all the pending motions in the case on June 20, 2005.

### Standard of Review

In response to Westfall v. Erwin, 484 U.S. 292 (1988), Congress enacted the Federal Employee Liability Reform and Tort Compensation Act, codified at 28 U.S.C. §§ 1346(b), 2671-80, commonly known as the Westfall Act. The Westfall Act immunizes a federal employee from liability for his "negligent or wrongful act[s] or omission[s] . . . while acting within the scope of his office or employment . . .." 28 U.S.C. § 2679(b)(1). When a federal employee is sued, the United States Attorney, acting on behalf of the Attorney General, must certify whether that employee was in fact acting within the scope of his or her employment at the time of the alleged tortious act. 28 U.S.C. § 2679(d)(1). Thus, once the United States Attorney for the district certifies an employee was acting within the scope of his federal employment at the time of the incident complained of, the United States is substituted for the employee as a party defendant.

The United States Supreme Court has held that the Attorney General or United States Attorney's Westfall certification is subject to judicial review by the district court. Guiterrez de Martinez v. Lamagno, 515 U.S. 417 (1995). The United States Attorney's scope of employment certification is prima facie evidence that the defendant federal employee acted within the scope of his employment. Gutierrez de Martinez v. DEA, 111 F.3d 1148, 1153, 1155 (4th Cir. 1997). The certification shifts the burden to the plaintiff to prove, by a preponderance of the evidence, that the defendant federal employee was acting outside the scope of his employment. Id. at 1153-54; Maron v. United States, 126 F.3d 317, 323 (4th Cir. 1997). The Fourth Circuit has noted that the plaintiff must present "persuasive evidence

4

refuting the certification." <u>Maron</u>, 126 F.3d at 323. "To carry its burden, the plaintiff must submit specific evidence or the forecast of specific evidence that contradicts the Attorney General's certification decision, not mere conclusory allegations and speculation." <u>Borneman v. United States</u>, 213 F.3d 819, 827 (4th Cir. 2000); <u>Gutierrez</u>, 111 F.3d at 1155. In assessing whether the plaintiff has rebutted a *prima facie* case presented by the United States Attorney's scope-of-employment certification that defendant federal employee was acting within the scope of his employment at time of incident, the district court need not defer to the United States Attorney's certification, but should instead review the question *de novo*. <u>Id.</u> If the plaintiff presents persuasive evidence refuting the certification, the government must provide evidence and analysis to support its conclusion that the torts occurred within the scope of employment. <u>Maron</u>, 126 F.3d at 323. At all stages of the process, it is for the court to weigh the sufficiency of the evidence, to determine whether genuine issues of fact exist, and ultimately to resolve these factual issues. <u>Borneman</u>, 213 F.3d at 827.

## Discussion

### I. **Westfall Certification**

In determining whether the defendant was within the scope of employment, the district court shall apply the law of the state in which the alleged tort occurred. <u>Borneman</u>, 213 F.3d at 827. As all of the actions complained of herein occurred within the state of South Carolina, the court is bound by the law of this state in determining whether LTC Smith's actions were indeed within the scope of his employment.

South Carolina has rejected the common law test for scope of employment in favor of an arguably more lenient one. South Carolina has adopted the rule that "[i]f the servant is doing some act in furtherance of the master's business, he will be regarded as acting within the scope of his

5

employment, although he may exceed his authority." <u>Jones v. Elbert</u>, 34 S.E.2d 797, 798-99 (S.C. 1945)

*quoting* <u>Cantrell v. Claussen's Bakery</u>, 174 S.E. 438, 440 (1934).  However, if the servant acts in a

manner not furthering his master's business, or for some independent purpose of his own, his conduct

falls outside the scope of his employment.  <u>Hancock v. Aiken Mills</u>, 185 S.E. 188 (1936); <u>Hyde v.</u>

<u>Southern Grocery Stores</u>, 15 S.E.2d 353 (1941).  "What is within the scope of employment may be

determined by implication from the circumstances of the case." <u>Hamilton v. Miller</u>, 389 S.E.2d 652,653

(S.C. 1990).

 In this case, Plaintiff argues both that LTC Smith's acts were done in a manner not furthering

the interests of the United States, and that he was acting for some independent purpose of his own.

 The plaintiff argues that the central issue of this case with respect to whether LTC Smith's

actions fall within the scope of his employment is the investigation which was conducted into the

allegations against Baird of wrongdoing in the performance of his job as ROO at PC.  Plaintiff alleges

that this investigation was conducted in such a manner as to remove it from the scope of LTC Smith's

employment.  Plaintiff bases this argument on his allegations that evidence in the investigation was

fabricated by LTC Smith, and that the investigation was otherwise designed with the sole purpose of

justifying a predetermined termination decision.

 The record reflects that after the allegations of misconduct were raised by the cadet, LTC Smith

directed MAJ Wolf to conduct an investigation into Baird's conduct with respect to her contracting and

an investigation into the medical qualification of the cadet.  As an initial matter, Plaintiff states that the

substance of the investigation into his conduct with respect to the cadet's contracting is of some

relevance.  Plaintiff points to the fact that MAJ Wolf admitted in his deposition that he did not contact

Baird as part of his investigation to elicit a statement or any other defense from him.  Additionally, the

6

plaintiff states that MAJ Wolf did not contact SFC Tab Boiter nor LT Furtick, two other individuals accused of having knowledge of the cadet's health issues and counseling her to falsify her ROTC physical forms to conceal those issues. (Wolf Dep. p. 42, 1-13). Instead, the plaintiff states that MAJ Wolf testified that he submitted with his recommendation and investigation findings only a written statement from the cadet, a written statement from the cadet's mother, and the medical records which had been obtained from the cadet's treating physician. The plaintiff argues that MAJ Wolf did not contact Baird as part of his investigation because MAJ Wolf had been supplied with a Memorandum for Record, type-written by LTC Smith which outlines an alleged confession by Baird. MAJ Wolf admitted that he wasn't present during the alleged confession of Baird and that he had no personal knowledge that Baird admitted to knowing about the cadet's disqualifying condition or that she was receiving counseling or taking a prescribed medication. Further, he has no direct knowledge of Baird's alleged admission that he chose not to inform LTC Smith about these conditions. (Wolf Dep. p. 42, 14-15; p. 56, 15-25).

Plaintiff states that LTC Smith alleges that this confession occurred on Tuesday, April 8, 2003, in his office on PC campus. Therein, LTC Smith alleges that Baird admitted to knowing about the cadet's eating disorder, depression and medication, and allegedly admitted to counseling the cadet to lie on her pre-physical questionnaire. (Memorandum For Record, dated April 8, 2003, signed by LTC Smith). Plaintiff raises several issues with respect to this confession. First, Baird denies confessing these wrongdoings, ever having a meeting with LTC Smith in his office, or otherwise being in Smith's office from the time he left PC until the present. Plaintiff states that the document itself provides no assistance in resolution of this issue as the confession is not signed or otherwise acknowledged by him. Plaintiff argues that a confession of this nature, whether prepared in the federal or private sector, should

7

contain some acknowledgment of its contents by the confessor.

Second, Baird asserts that he would not have had the opportunity to be at PC at the time alleged due to his military mobilization status. The plaintiff states that after he left the ROTC program to begin his pre-deployment training at Ft. Jackson, he lived on the base in barracks until the time of his deployment. At the time of the alleged confession, twelve days before his deployment to Iraq, Plaintiff states that his liberty was severely curtailed because of pre-deployment preparations by his unit. Baird states that he would have had to request, and be granted a pass in order to leave the post. Baird states that he cannot recall ever leaving the base during the week in question for any personal business. The plaintiff argues that the United States failed to produce any pass or other records in the Army's possession to indicate that he was off-post at the time of the alleged meeting and confession between he and LTC Smith. Further, the plaintiff argues that the United States has produced no other corroborating witness who was present at the meeting between he and LTC Smith during which the alleged confession was offered. The plaintiff argues that without the confession there is no evidence of any contact with Baird in relation to this investigation.

Plaintiff further states that COL Holloway, LTC Smith's superior officer, clearly testified that the individual accused in an allegation such as this should normally and properly be questioned by the investigating officer. (Holloway Dep. p. 26, 2-7). Plaintiff argues that he lived less than an hour away from PC after his activation, and that there was ample time prior to his deployment for someone from the ROTC unit to contact him with regard to these allegations. However, Baird states that he had no knowledge of the investigation until he received an email communication from his Comtek supervisor while he was in Iraq. The plaintiff states that without the confession the investigation conducted by the ROTC department is substantially incomplete and not sufficient to warrant the action taken against him.

8

Further, the plaintiff argues that if the confession is not true and accurate, it is manufactured in order to lend credence to an otherwise deficient investigation. The plaintiff argues that the manufacturing of evidence in order to justify the termination of a soldier deployed at time of war from his private employment is not within the legitimate interests of the United States, and thus not within the scope and employment of a United States Army officer.

LTC Smith also alleges that he was acting within the scope and course of his federal employment because he terminated Baird at the direct orders of his superior officer COL Holloway. The plaintiff points out that LTC Smith alleges that despite any personal animus, he was required to terminate Baird by virtue of the order from his superior officer, placing his actions within the scope of his federal employment. Plaintiff argues that this assertion is not supported by the timeline of events and by COL Holloway's own testimony.

LTC Smith testified that on April 23, 2003, MAJ Wolf supplied COL Holloway with his investigatory materials which included the cadet's written statement, her mother's written statement, the medical questionnaire forms, and Baird's confession. (Smith Dep. p. 149, 2-10). LTC Smith testified that MAJ Wolf presented those documents to COL Holloway with no contemporaneous recommendation as to disciplinary action by either MAJ Wolf or LTC Smith, immediately after which COL Holloway stated "Baird needs to go. This is not the first incident we've had with him." COL Holloway then directed LTC Smith to initiate action to terminate Baird's employment. (Smith Dep. p. 149, 22; p. 150, 5). However, Plaintiff argues that in COL Holloway's deposition he denied ever making any type of comment or other directive that Baird be terminated. (Holloway Dep. p. 42). Both LTC Smith and MAJ Wolf testified very clearly that COL Holloway told them that Baird "had to go." The plaintiff argues that COL Holloway was equally clear that he did not recall making any statement

9

of this nature.

The plaintiff states that COL Holloway painted a slightly different picture of these events in his deposition. COL Holloway testified that LTC Smith brought to his attention that there might be a problem with a cadet who had been incorrectly advised not to report a medical condition that she had. COL Holloway then directed LTC Smith to conduct an investigation into the cadet's medical condition, which later indicated that the cadet did have a disqualifying medical condition and that Baird had instructed her not to disclose it. (Holloway Dep. p. 10, 4-14).

COL Holloway then directed LTC Smith to do a Commander's Inquiry into the allegations of wrongdoing on the part of Baird. He asked LTC Smith to make a recommendation based on LTC Smith's investigation. (Holloway Dep. p. 16, 14-23). COL Holloway indicated that he ratified LTC Smith's recommendation memorandum dated May 22, 2003 as his own. COL Holloway ratified this document by putting his initials on it and forwarding it up the chain of command to his superior officer at Cadet Command, COL Allard. (Holloway Dep. p. 18, 13-25). Thus, the plaintiff argues it is clear from both COL Holloway's testimony and the documentary evidence on the record that COL Holloway made his termination recommendation based only on the recommendations and representations made by LTC Smith, as well as his belief that everything represented in the documentation of LTC Smith's investigation was truthful.

The plaintiff states that it is further troubling that under LTC Smith's version of events the alleged date of the termination decision was April 23, 2003, and that was as much as a week before the cadet was actually medically disqualified from participation in the ROTC program and two weeks before the disenrollment packet was completed by LTC Smith for the cadet. Plaintiff further argues that based on the events as LTC Smith has testified to them, the termination decision was made as much as

two weeks before LTC Smith appointed MAJ Wolf as the investigating officer into the allegations of misconduct against Baird. Thus, the plaintiff states that if LTC Smith's version of events were to be accepted, then the termination decision was made before an investigation was undertaken. Therefore, the plaintiff states that the conclusions of the investigation were mandated before it even began.

Plaintiff argues that in order for LTC Smith's actions to fall within the scope of his employment with the federal government, he must be serving a federal government interest. The plaintiff states that given his record of exemplary service, his accomplishments with the PC ROTC brigade, and his war time service with the United States Army, it cannot be presumed that terminating his employment without notice, while he was deployed overseas, and after conducting an alleged sham investigation which was initiated simply to lend credence to a determination decision that had already been made, was an act taken within the U.S. Army's interest.  Furthermore, Plaintiff notes that it is inconceivable that LTC Smith can justify the termination of an officer with such an exemplary record, without a credible investigation or so much as a discussion with that officer, while the officer is deployed to a combat zone during time of war.  The plaintiff argues that the timing of these actions immediately calls them into suspicion.  According to LTC Smith's May 22 memorandum, it appears LTC Smith observed a "trend of poor values" in Baird which surfaced in the space of less than a month, from the time of his superior evaluation of Baird, until the time Baird was deployed to Iraq.  The plaintiff states that while this supposed trend was severe enough to warrant the termination of him, such a recommendation was not made until three months after he was activated, and a mere three days after he was deployed to Iraq. The plaintiff argues that it appears that LTC Smith availed himself of the fact that Baird was in Iraq, effectively denying Baird access to any grievance procedure which would have been available to him, either through PC, Comtek or the U.S. Army.

11

The Government acknowledges that the plaintiff criticizes the scope and extent of the investigation conducted by MAJ Wolf and LTC Smith. However, the Government argues that this complaint overlooks the fact that LTC Smith went above and beyond what was required by the contract between the U.S. Army and Comtek. The contract between the U.S. Army and Comtek provided that upon the receipt of allegations of misconduct by Comtek personnel, the government could conduct an informal inquiry or informal investigation into the matter. Furthermore, the contract provided that investigations that tended to substantiate inappropriate conduct by Comtek personnel were grounds for replacement of the Comtek employee. Finally, the contract provided that the Army had no obligation to interview the Comtek employee being investigated for misconduct. (Army/Comtek Contract ¶ C.5.10.3; see also USA Exhibit 7 (Affidavit of Lawrence C. Rose, Jr, signed March 11, 2005 at ¶ 8)).

The Government argues that certainly the investigation into Plaintiff Baird's role in the recruitment and contracting of the cadet met the requirements of the Army/Comtek contract. In addressing the allegations that a decision to terminate was made before an investigation into Baird's conduct, the Government points out that on March 25, 2003, Ms. Cathy Whitman (ROTC Human Resources Assistant) discovered the significant information that there was a discrepancy in the two sets of medical forms the cadet had submitted and she made LTC Smith aware of this information at that time. LTC Smith then ordered MAJ Wolf to gather information regarding the cadet's medical condition. MAJ Wolf obtained a statement from Cathy Whitman (USA Exhibit 3), a statement from the cadet (USA Exhibit 4), and a letter from the cadet's mother (USA Exhibit 5). MAJ Wolf also obtained some of the cadet's medical records which showed that she had an eating disorder and depression, and that she was taking Zoloft.

In Ms. Whitman's statement, dated April 1, 2003, she said that a Gold Bar Recruiter told her

12

that Plaintiff was aware that the cadet had an eating disorder. Yet when Ms. Whitman attempted to talk to Plaintiff about this issue on more than one occasion, Plaintiff said he did not want to hear about it and didn't want to know anything. (USA Exhibit 3). Plaintiff claims never to have spoken to Ms. Whitman about this cadet's medical condition.

In the cadet's statement, dated April 1, 2003, she stated that she told Plaintiff about her eating disorder and that she was taking prescription medication on a daily basis. She stated that she was told that her condition would not affect her performance in the military. While filling out her FORM 2492 in February 2002, she stated that she brought up her medical condition and was asked by Plaintiff and SFC Boiter, "Are you struggling with the eating disorder *right now*? Do you feel you *have* to have this medicine? How long do you think you'll be on medication? Do you think that your condition will escalate or affect your performance in the military? " She says she was told that "as long as I didn't think it was a problem there was always a way to get around it." The cadet said that "going against my better judgment and stretching the truth I answered "no" to both question number 14 and 61."[2] (USA Exhibit 4, at paragraph 2). Plaintiff claims that he never pressured the cadet to leave any information off the medical forms.

In her letter, dated April 9, 2003, the cadet's mother stated that she discovered her daughter's eating disorder in October 2001. She stated that she discussed her daughter's eating disorder with Plaintiff at this time and was surprised by his lack of concern. She stated that after October 2001, she spoke with and met personally with Plaintiff numerous times to express her concern about her daughter's eating disorder and depression, and the fact that she was taking anti-depressants for her

---

[2]  Question 14 asks whether a recruit has ever or currently takes medication regularly and Question 61 asks whether a recruit has ever or currently has an eating disorder. (USA Exhibit 1).

13

eating disorder.  Despite this, her daughter was still being encouraged to join ROTC.  The cadet's mother also noted that before her daughter's physical in spring of 2002, she asked whether the information about her daughter's eating disorder and use of medication would be listed and she was told that "there wasn't a place for it on the form."  She also said in her letter that she "tried time and time again to get Capt. Baird to understand that this child has an eating disorder and I was told 'don't worry; we'll knock it out of her after she signs,' and I replied 'If only it was that easy.'" (USA Exhibit 5).  Plaintiff denies that he said any of these things to the cadet's mother.  Additionally, as mentioned above, MAJ Wolf also obtained a number of medical records which confirmed that the cadet had an eating disorder and depression and that she was taking Zoloft.

The Government argues that MAJ Wolf collected this evidence before the termination decision and, at a minimum, it "tend[ed] to substantiate inappropriate conduct by contractor personnel," (Army/Comtek Contract ¶ C.5.10.3) namely Plaintiff Baird.  The Government notes that because the Army had a clear contractual right to conduct an investigation of Plaintiff as it did, and because it was LTC Smith's job to direct and conduct such an investigation, Plaintiff's criticism of the investigation fails to demonstrate that LTC Smith was outside the scope of his employment when he conducted the investigation.   Instead, the Government states that it is clear that LTC Smith was "doing some act in furtherance of the master's business."

The Government also acknowledges that the plaintiff claims that he never met with LTC Smith on April 8, 2003, and that LTC Smith fabricated this meeting.  The Government argues and the court finds this denial is not sufficient for Plaintiff to meet his burden to prove, by a preponderance of the evidence, that LTC Smith was acting outside the scope of his employment.  Gutierrez de Martinez, 111 F.3d at 1153-54; Maron v. United States, 126 F.3d at 323.  This blanket denial is not the required

14

"persuasive evidence refuting the certification." Maron, 126 F.3d at 323. Instead of specific evidence or the forecast of specific evidence, Plaintiff has merely provided a conclusory denial.

The Government argues that an overwhelming amount of evidence suggests that Plaintiff met with LTC Smith at the ROTC office on April 8, 2003. Most importantly, the Government states that there is no dispute that LTC Smith prepared a Memorandum for Record dated April 8, 2003, which states the following:

> 1. This memorandum is to document a conversation I had with MAJ John Baird on 8 Apr 03 in reference to Cadet [redacted].
>
> 2. I informed MAJ Baird that Cadet [redacted] recently made a statement saying that he and SFC Tab Boiter knew that she was taking medication for treatment of an eating disorder and depression. Cadet [redacted] also stated that MAJ Baird indicated to her to not reflect this information on her physical because she would not qualify for contracting in ROTC.
>
> 3. MAJ Baird stated the following:
>
> > a. That at the time of contracting (Aug 02), he knew Cadet [redacted] suffered from an eating disorder. He had known about this eating disorder since the time she was a freshman (she is now a junior) and had spoken with her mother reference this several times. He did not know about the depression at this time or about her taking medication. He discussed this issue with both Cadet [redacted] and her mother. He stated that he did not think this was a disqualifier even though it is a specific question on the physical. He advised [the cadet] not to check that she had this condition. Knowing the above he allowed me to contract [sic] Cadet [redacted].
>
> > b. MAJ Baird stated he became aware of Cadet [redacted]'s depression and medication in Dec 02. He knew at this time she was taking Zoloft. He made the decision at that time not to inform me of this information. He could not give a reason.
>
> > c. MAJ Baird stated he was sorry for allowing this to go this far.
>
> 4. This conversation took place in my office at approximately 1600, 8 Apr 03.

(Memorandum For Record, dated April 8, 2003, signed by LTC Smith).

There is no dispute that this memorandum was prepared on April 8, 2003, by LTC Smith. (Smith Dep. pp. 195-96). There is also no dispute that this memorandum was presented to MAJ Wolf

15

on April 8, 2003 by LTC Smith.  (Smith Dep. p. 196).

The Government notes that the April 8 Memorandum for Record states that Baird had "spoken with [the cadet's] mother reference this [the eating disorder] several times."  This statement is consistent with the information in the mother's April 9, 2003, letter.  The Government also notes that it appears that the only way LTC Smith could have known this information on April 8, 2003, to include it in his memorandum for record is from a conversation with Baird on April 8, 2003.

The Government argues that the testimony of Cathy Whitman also strongly suggests that Plaintiff met with LTC Smith at the ROTC Office on April 8, 2003.[3]  Despite Baird's claim that he was never in the PC ROTC offices from February 10 through April 20, 2003, Ms. Whitman testified in her deposition that she saw Baird in the ROTC offices in early April 2003.  She testified that Baird came in the ROTC offices and went into LTC Smith's office. (Whitman Dep. pp. 37- 40).  Ms. Whitman testified that after Baird came out of LTC Smith's office, LTC Smith came out a few minutes later.  Ms. Whitman said that she asked LTC Smith how things went.  LTC Smith stated that Baird "said he didn't have any reason for what he did." (Whitman Dep. p. 39).[4]  The court notes that Baird has failed to come forward with sufficient corroborating information or evidence to support his denial that he met with LTC Smith on April 8, 2003.

The court is left to conclude that Plaintiff did meet with LTC Smith on April 8, 2003.  The contemporaneously made April 8, 2003, memorandum strongly rebuts the possibility that LTC Smith

---

[3]  Baird noted in his deposition that he found Ms. Whitman to be an honorable person and that he did not know of any reason she would lie.  (Baird Dep. p. 59).

[4]  LTC Smith testified that Ms. Whitman was in the ROTC Offices when Baird came in on April 8, 2003, and that LTC Smith spoke to her after Baird left.  (Smith Dep. p. 193-94, 196).

later fabricated the meeting.  Additionally, Baird's blanket denial that he was ever in the PC ROTC offices from February 10 through April 20, 2003 is greatly undermined by Ms. Whitman's testimony that such a meeting did take place.  Baird's lack of credibility on the fact that a meeting even took place leaves him with little credibility as to what was discussed at the meeting.  Perhaps most importantly, there is simply no basis for concluding that LTC Smith had any incentive or motive to fabricate the meeting.  If LTC Smith had been unable to meet with Baird, he could have recited this fact[5] and reached the same conclusions based on the other substantial evidence before him that Baird had counseled the cadet to provide false answers in her initial medical form questionnaire.  For all these reasons, the court finds it much more probable than not that LTC Smith and Plaintiff met on April 8, 2003, and that LTC Smith's April 8, 2003 memorandum accurately reflects the substance of that meeting.[6]

Furthermore, the Government argues that even if LTC Smith had fabricated the April 8, 2003, meeting as the plaintiff suggests, it would not take his investigation and recommendations outside the scope of his employment.  South Carolina law requires that the actions of the employee be looked at in context.  Hamilton, 389 S.E.2d at 653; see also Maron, 126 F.3d at 325 ("we have previously emphasized the importance of looking at the allegedly tortious act in context, rather than in a vacuum, in deciding whether it is within the scope of employment.").  The Government states that it is clear that all acts of LTC Smith were done in his role as PMS.  Furthermore, all his acts were done in the context

---

[5]  The contract between the Army and Comtek expressly provides that personnel such as Plaintiff need not be interviewed prior to recommending that personnel such as Plaintiff be replaced.  Army/Comtek Contract at ¶ C.5.10.3.  (See also USA Exhibit 7 (Affidavit of Lawrence C. Rose, Jr, signed March 11, 2005, at ¶ 8)).

[6]  The court notes that Plaintiff has failed to produce "persuasive evidence refuting" that the April 8, 2003 meeting occurred.  Maron v. United States, 126 F.3d 317, 323 (4th Cir. 1997).

of an investigation about a cadet providing false information on her medical application and Plaintiff's alleged role in the matter. The government states that even if—assuming the worst possible facts—LTC Smith had fabricated the April 8, 2003, meeting to add to the significant evidence of Plaintiff's misconduct and to bolster a recommendation that Plaintiff be terminated, this activity would not fall outside the scope of his employment.

The Government states that an instructive South Carolina Supreme Court case which supports this conclusion is Todd v. S.C. Farm Bureau Mut. Ins. Co., 336 S.E.2d 472 (S.C. 1985). In Todd, Parrish, an investigator for Equifax, conducted an investigation for an insurance company claims manager regarding a high number of fires in an area. Id. After several months, Parrish informed the claims manager and Todd, an insurance agent, that an informant had told Parrish that "Todd was hindering Equifax's investigation by leaking information to a torch man." Id. at 473. Eventually, Todd was fired by the claims manager based, in part, on Parrish's allegations. Id. "It became highly doubtful whether Parrish's informant, who allegedly accused Todd of leaking information, ever in fact existed. Parrish initially identified the informant , retracted the identification, then named a police officer. The officer testified at trial that he never told Parrish that Todd leaked information." Id. The jury found Equifax liable for intentional interference with Todd's employment contract based, in part, upon Parrish's fabricating of an informant. Id. The Supreme Court upheld this verdict indicating that Parrish was acting within the scope of his employment even when allegedly fabricating information against Todd. Id. In this case, the Government argues that clearly, LTC Smith, even if he had fabricated the April 8, 2003, meeting, would have been as much in the scope of his employment as Parrish was in the Todd case.

Similarly, the Government points out that the South Carolina Court of Appeals in Murphy v.

18

Jefferson Pilot Communications Co., ___ S.E.2d ___, 2005 WL 1033489 (S.C. App. May 2, 2005), held

that a television station manager could be acting within the scope of his employment when he allegedly

defamed Murphy, a female attorney.  The station manager allegedly fabricated a story that Murphy had

been drunk on an airplane flight and had said slanderous things about another female attorney[7] during

the flight.  Id.  After noting that "[c]learly, there is legal authority that a principal may be held liable for

defamatory statements made by an agent acting within the scope of his employment," Id. at *4, the

Court of Appeals held that the trial court erred when it directed verdicts in favor of the television station

and the televison station's parent company.  Id. at *6.

The Government argues that both Todd and Murphy make clear that even when an employee

fabricates information about a person in connection with some aspect of the employee's employment,

this alleged fabrication is within the employee's scope of employment.  Similarly, the Government

states that if LTC Smith had fabricated the April 8, 2003, meeting, such fabrication still would have

been related to the proper investigation that was required of him, and that was clearly within the scope

of his employment.  See also South Carolina Budget and Control Board v. Prince, 403 S.E.2d 643, 646-

47 (S.C. 1991) (holding that school board member within scope of employment when he called a press

conference without the school board's express authorization and defamed school board chairman and

past chairman by accusing them of "malfeasance, fraud, mismanagement [of district funds], illegal bid-

solicitation practices, kickbacks, and bribery"); Singleton v. United States, 277 F.3d 864, 871 (6th Cir.

2001) (Major in National Guard found to be acting within the scope of his employment when he

allegedly filed false and degrading reports and leaked confidential information regarding a Captain in

National Guard that the Major supervised); Brumfield v. Sanders, 232 F.3d 376 (3rd Cir. 2000)

---

[7] This other female attorney appeared on the televison station as a commentator.

19

(statements made by co-workers in a Bureau of Prison's Internal Affairs investigation, *even if false*, were within the scope of the coworkers' employment); <u>McHugh v. University of Vermont</u>, 758 F.Supp. 945, 952 (D.Vt. 1991) (Despite the fact that his actions were "wrongful and reprehensible," Professor of Military Science was within the scope of his employment when he retaliatorily discharged his secretary after she complained about being sexually harassed by a Major in the ROTC Department), <u>aff'd</u>, 966 F.2d 67 (2nd Cir. 1992).

Therefore, because a fabricated interview between LTC Smith and Plaintiff would be related to LTC Smith's duties, the Government argues and this court finds that Plaintiff's denial that the April 8, 2003, meeting took place does not affect the determination that LTC Smith was acting within the scope of his duties as PMS.  However, as noted above, the court finds that the clear weight of the evidence indicates that the April 8, 2003, meeting between LTC Smith and Plaintiff did take place.

The Government also notes that on April 23, 2003, COL Holloway came to visit the ROTC program.  The Government argues that MAJ Wolf and LTC Smith presented the information MAJ Wolf had collected about the recruitment of the cadet and Baird's alleged misconduct to COL Holloway. (Wolf Dep. pp. 31-32; Smith Dep. pp. 153-156; 197-98).  The Government maintains that both MAJ Wolf and LTC Smith testified that COL Holloway ordered LTC Smith to take action to initiate paperwork to recommend the termination of Baird.  (Wolf Dep. pp. 31-32; Smith Dep. p. 198).[8] Although COL Holloway had no specific recollection of that direction, the Government states that he testified that when LTC Smith was apprised of an allegation that one of the people under his command had committed an integrity violation, LTC Smith was obligated, as was everyone in the chain of

---

[8]  Both Wolf and Smith recall Holloway saying that Baird "needed to go" at the April 23, 2003, meeting.  (Wolf Dep. pp. 31-32, 33, 50; Smith Dep. p.153-56, 197-98).

command, to look into the matter. (Holloway Dep. pp. 15-16, 42). The Government argues that this is consistent with the proposition that someone who committed such a violation would be removed. The Government also notes that COL Holloway also did not identify any point in time other than April 23, 2003, when the decision to remove Plaintiff was made.

Another significant fact the Government points out is that on this same day, April 23, 2003, COL Holloway called Lawrence C. Rose, Jr. of Comtek to inform him that "the Army was investigating certain alleged irregularities in Major Baird's recruiting and enrollment of an ROTC cadet." (USA Exhibit 7 (Affidavit of Lawrence C. Rose, Jr, signed March 11, 2005 at ¶ 12)).

In an email sent by LTC Smith to COL Holloway on April 28, 2003, LTC Smith told COL Holloway: "Spoke with Larry Rose this morning. He will send John Baird a notification letter giving him the option of either resigning or being fired. He will also send our temp hire ROO, CPT Rob Clapper, a permanent contract. Rob is doing a great job and I am sure [he] will accept the permanent position. I hate this has had to come to this but it is the right thing to do. Larry told me he will take all necessary actions. We will continue to offer to help John's wife while he is deployed. Thanks for your help in getting this resolved so quickly." (USA Exhibit 8).

The Government states that there is no dispute in the record that the decision to recommend the termination of Baird was made, at the latest, on April 28, 2003. This is clear from the email from LTC Smith to COL Holloway on April 28, 2003. The Government argues it is also clear from a meeting that LTC Smith had with the Dean of Students at PC, David Gillespie, on May 1, 2003. At this meeting LTC Smith informed Dean Gillespie that COL Holloway had made the decision to initiate action to terminate Plaintiff from the ROTC Battalion because of the recruiting irregularities regarding the cadet. (Smith Dep. p. 220). After being informed of this decision, Dean Gillespie informed LTC Smith of a

21

prior incident involving Plaintiff and the wife of a PC football coach. In that incident, which Plaintiff admits occurred, Plaintiff made offensive remarks about the sexual characteristics of the body of the wife of the coach. As a result of this incident, Plaintiff was reprimanded and required to apologize and to undergo remedial sexual harassment training.

In a memorandum dated May 1, 2003, the Army Cadet Command informed LTC Smith that the Cadet Command Surgeon had determined that the cadet was "medically disqualified for continuation in the [ROTC] program due to an eating disorder and depression." (USA Exhibit 9). The memorandum also ordered LTC Smith to appoint an investigating officer to determine whether the cadet "failed to disclose a disqualifying condition prior to entering the ROTC program." (USA Exhibit 9). As a result of this memorandum from Cadet Command, the Government states that on May 7, 2003, LTC Smith also appointed MAJ Wolf as the investigative officer in this regard. (USA Exhibit 10). On May 13, 2003, LTC Smith prepared and signed a memorandum accepting the findings and recommendations from MAJ Wolf regarding the cadet. Included in this memorandum was recommendation No. 5 that the cadet "should not be ordered to repay her valid debt to the U.S. Government comprised of advanced educational assistance received in the form of scholarship benefits. Cadet [redacted] entered into the contract in good faith. Cadet [redacted] was improperly advised prior to contracting that it was not necessary for her to disclose her existing eating disorder and depression." (USA Exhibit 11).

LTC Smith prepared a May 22, 2003, memorandum recommending that Plaintiff be terminated. This memorandum was addressed to LTC Smith's superiors. (USA Exhibit 12)

The May 22 Memorandum contains the following statements:

* "Recommend MAJ Baird by terminated from employment with Cadet Command at Presbyterian College as a COMTEK employee."

22

\*      "The investigation reveals that MAJ Baird, employed as our ROO, misled a cadet and allowed her to contract and receive money she was not qualified to receive."

\*      "MAJ Baird admits to knowing Cadet [redacted] medically disqualifying condition and that she was receiving counseling and taking prescribed medication for her condition."

\*      "Cadet [redacted] states that MAJ Baird improperly advised her not to reflect her condition on her physical form and that 'there is always a way to get around these things.'"

\*      "This incident is not a one-time mistake, but is indicative of a trend of poor values. Discussing this case with our college's Vice-President of Academic Affairs, he informed me that prior to my arrival as PMS, MAJ Baird made unprofessional and sexually harassing comments, in the presence of cadets, about the wife of one of our football coaches. This coach's wife overheard the comments and filed a complaint with the college."

(USA Exhibit 12). This memorandum was sent up the chain of command. COL Holloway approved the memorandum on May 28, 2003. (USA Exhibit 12; Holloway Dep. p. 14). The Region Commander, COL Allard signed off on the memorandum on May 30, 2003. (USA Exhibit 12; Holloway Dep. p. 14-15).

Eventually, On June 24, 2003, Comtek received a letter from the United States Army Contracting Officer directing Comtek to replace Baird. (USA Exhibit 7 (Affidavit of Lawrence C. Rose, Jr, signed March 11, 2005 at ¶ 15)). By letter dated June 25, 2003, Comtek notified Baird that, based upon the direction of the Army Contracting Officer, Comtek was terminating his employment effective June 30, 2003. (USA Exhibit 7 (Affidavit of Lawrence C. Rose, Jr, signed March 11, 2005 at ¶ 16)).

After applying South Carolina law to the present case the court finds that LTC Smith was acting within the scope of his employment as an officer with the U.S. Army assigned to serve as Professor of

Military Science ("PMS"). "The PMS is the key to the success of the ROTC program." 32 C.F.R. § 562.6(c). He oversees the entire ROTC program at each institution. Clearly, the investigation into matters related to the recruiting and the contracting of the cadet falls within LTC Smith's scope of employment with the U.S. Army. It is obviously the policy of the Army to have recruiters who encourage truthfulness in cadets and who see that the medical conditions of recruits and cadets are reported accurately before they are called upon to go and lead other soldiers in harm's way. (See Wolf Dep. pp. 19-20; 32 C.F.R. § 562.4). There is no dispute that LTC Smith was required, according to the values based system of the Army, to conduct an inquiry into the recruitment of the cadet to determine why she did not disclose her eating disorder and her use of Zoloft for depression. Furthermore, according to LTC Smith's superior officer, when the alleged misconduct of Plaintiff was exposed, LTC Smith was obligated to look into the matter. (See Holloway Dep. pp 15-16) It is important to note that the investigation turned up significant evidence from several sources that Plaintiff Baird engaged in misconduct in the recruitment and the contracting of the cadet.[9]

As mentioned above, the court notes that the plaintiff has theorized that "while [LTC] Smith's actions appear facially to be within the scope of his employment, upon further scrutiny it is apparent that they are in fact motivated out of some unknown personal conflict he had with Baird, and thus his actions were not designed to further any conceivable interest of his employer, the U.S. Army." (Doc. # 19, p. 5). However, the plaintiff fails to point to any evidence to support his assertion that LTC Smith had ill will or animus toward him. The Fourth Circuit addressed this type of unsupported assertion of

---

[9] The court also notes that Plaintiff admitted in his deposition that he knew the cadet had an eating disorder prior to her contracting with the ROTC and before she filled out the medical form. However, the plaintiff states that he did not know the severity of the disorder at that time. (Baird Dep. pp. 30-31).

ill will by a plaintiff challenging a Westfall certification in <u>Maron</u>, where the Court held that unsubstantiated speculation about ill will of co-workers is not enough to transform acts which are facially within the scope of the co-workers' employment into acts that fall outside of that scope. <u>Maron</u>, 126 F.3d at 327, <u>citing</u> <u>RMI Titanium Co. v. Westinghouse Elec. Corp.</u>, 78 F.3d 1125, 1143 (6th Cir. 1996). Plaintiff states that LTC Smith's actions appear facially to be within his scope of his employment. The evidence gathered in the discovery demonstrates no ill will or animus as alleged by Plaintiff. In fact, Baird testified in his deposition that he "got along okay" with LTC Smith and never had any problems with him. (Baird Dep. p. 36). LTC Smith had recently given Plaintiff an excellent review. (Baird Dep. p. 36). Furthermore, LTC Smith noted in his April 28, 2003, email to Colonel Holloway, "I hate this has had to come to this but it is the right thing to do." (USA Exhibit 8). He also noted, "[w]e will continue to offer to help John's wife while he is deployed." (USA Exhibit 8). As such, the court finds that the plaintiff has failed to present sufficient evidence that LTC Smith had any ill will toward Plaintiff which takes LTC Smith's actions out of his scope of employment.

The court finds that it is clear that Plaintiff has failed to prove by a preponderance of the evidence that LTC Smith was acting outside the scope of his employment. In fact, the evidence produced from the taking of eight depositions and voluminous written discovery on the scope of employment issue is overwhelming that LTC Smith acted within the scope of his employment; he conducted the investigations and made the recommendations required of him. In short, Plaintiff has failed to produce sufficient evidence that demonstrates by a preponderance that LTC Smith was acting outside the scope of his employment. The court finds that Plaintiff has not produced sufficient evidence contradicting the certification decision and has only offered conclusory allegations and speculation. On the other hand, LTC Smith and the United States have demonstrated by overwhelming evidence that

LTC Smith was acting within the scope of his employment.

Therefore, the United States is substituted for LTC Smith, who is individually dismissed as a party defendant.

## II.    United States' Motion to Dismiss, or in the alternative, Summary Judgment

Once the United States is substituted, the plaintiff can seek relief only against the United States and only as allowed by the Federal Tort Claims Act ("FTCA").  If an exception to the FTCA shields the United States from suit, the plaintiff may be left without a tort action against any party.  Gutierrez de Martinez, 515 U.S. at 419;  Ross v. Bryan, 309 F.3d 830, 833 (4th Cir. 2002).

One limitation on the FTCA is its requirement that claimants pursue their administrative remedies before initiating an action in federal court.  28 U.S.C. § 2675(a).  This jurisdictional prerequisite to suit is designed to encourage the administrative consideration and settlement of claims, thereby reducing unnecessary litigation.  Deloria v. Veterans Administration, 927 F.2d 1009 (7th Cir. 1990).  The Fourth Circuit has consistently dismissed civil actions which were filed before the presentment of the administrative claim.  United States Automobile Association v. United States, 105 F.3d 185 (4th Cir. 1997);  Henderson v. United States, 785 F.2d 121 (4th Cir. 1985).

There is no dispute that Plaintiff has not presented an administrative claim as required by the FTCA.  Therefore, pursuant to  28 U.S.C. § 2675(a), this action must be dismissed for lack of jurisdiction.

This action also must be dismissed because the FTCA bars suit against the United States for libel, slander and interference with contract rights. 28 U.S.C. § 2680(h).  Thus, this court does not have subject matter jurisdiction over Plaintiff's defamation and interference with contractual relations claims against the United States.

26

## Conclusion

As stated above, because LTC Smith was acting within the scope of his employment at all relevant times mentioned in the complaint, the Government's Westfall certification is upheld, the United States is hereby substituted as Defendant, and the claims against LTC Smith are **DISMISSED**.  Further, because the FTCA bars Plaintiff's defamation and interference with contractual relations claims for money damages against the United States and because Plaintiff has failed to exhaust his administrative remedies as required by the FTCA, this court lacks subject matter jurisdiction over Plaintiff's claims against the United States and, therefore, these claims against the United States are **DISMISSED**.

**AND IT IS SO ORDERED.**

 s/ R. Bryan Harwell
R. Bryan Harwell
United States District Judge

Florence, South Carolina
August 18, 2005.

27