IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| John B. Baird, | ) | Civil Action No.: 6:03-3048-RBH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **O R D E R** |
| Communication Technologies, | ) | |
| Inc., Presbyterian College, | ) | |
| Lt. Col. Jonathan M. Smith and | ) | |
| David Gillespie, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Pending before the Court are Defendants Presbyterian College and David Gillespie's ("PC Defendants") motion to dismiss and for summary judgment. The motions of the United States and of Plaintiff, both relating to Westfall certification, are addressed in a companion Order (the "Westfall Order") which is being filed along with this Order.

I.    **THE PARTIES**

Plaintiff John B. Baird was at all relevant times a Major in the United States Army Reserve. He was employed by Defendant Communications Technologies, Inc. ("COMTek") as an ROTC instructor. Pursuant to a contract between COMTek and the United States Army, Plaintiff Baird was assigned to the Reserve Officers' Training Corps ("ROTC") Battalion centered at Presbyterian College, which serves the campuses of Presbyterian College, Lander University, and Newberry College (the "Scottish Highlander Battalion").

Defendant COMTek is a private government contractor that is in the business of providing manpower support to the Army for programs such as ROTC.

Defendant James Michael Smith ("LTC Smith") is a Lieutenant Colonel in the United States Army. At all times relevant to this case, he was assigned by the Army to serve as the Professor of Military Science for the Scottish Highlander Battalion. The United States has moved to be substituted as a party for LTC Smith and this Court found the substitution to be proper in the accompanying Westfall Order.

Defendant Presbyterian College ("PC" or the "College") is a private, not-for-profit, four-year liberal arts college affiliated with the Presbyterian Church (U.S.A.).

Defendant David Gillespie is on the faculty of Presbyterian College, and was at all times relevant to this case the Dean of the Faculty and PC's Vice President for Academic Affairs.

## II.    OVERVIEW OF THE CASE

This case arises out of the removal of Plaintiff Baird from his position as an Assistant Professor of Military Science and Recruiting Operations Officer with the Scottish Highlander Battalion centered at PC, and the termination by COMTek of his employment. As an employee of COMTek, Plaintiff Baird was assigned to the Scottish Highlander Battalion at PC. There, his primary responsibility was oversight of recruitment of students into the ROTC program and then, ultimately, into the Army.

This case involves the recruitment of one female cadet, whose application to the Army was overseen by Plaintiff Baird.[1] This cadet, a student at PC, had multiple medical conditions that disqualified her from contracting with the Army, including an eating disorder and the prescribed use of antidepressant drugs. Despite this, in her application materials, the cadet denied an eating disorder, denied use of any medications, denied depression, and denied being under medical care.

These false statements came to light at approximately the time that Plaintiff Baird had been notified that he was to be activated and deployed to Iraq. An investigation was conducted by Army personnel; in the course of the investigation, the cadet stated that Plaintiff Baird had counseled her to make these admittedly false statements. There is a factual dispute as to whether or not Plaintiff Baird admitted to LTC Smith that he advised the cadet to make the false statements.

The Army concluded that Plaintiff Baird had engaged in improper conduct, and determined that it would ask COMTek to remove Plaintiff Baird from his duties with the Scottish Highlander Battalion. The formal mechanism for this request was a May 22, 2003, memorandum authored by LTC Smith (the "May 22 Memorandum"). The May 22 Memorandum contains the following statements:

---

[1]  Because the cadet recruit's identity is irrelevant to this case, and because her medical history is relevant, her name is omitted from this Order.

\*      "Recommend MAJ Baird be terminated from employment with Cadet Command at Presbyterian College as a COMTek employee."

\*      "The investigation reveals that MAJ Baird, employed as our ROO, misled a cadet and allowed her to contract and receive money she was not qualified to receive."

\*      "MAJ Baird admits to knowing Cadet [**redacted**] medically disqualifying condition and that she was receiving counseling and taking prescribed medication for her condition."

\*      "Cadet [**redacted**] states that MAJ Baird improperly advised her not to reflect her condition on her physical form and that 'there is always a way to get around these things.'"

\*      "This incident is not a one-time mistake, but is indicative of a trend of poor values. Discussing this case with our college's Vice-President of Academic Affairs, he informed me that prior to my arrival as PMS, MAJ Baird made unprofessional and sexually harassing comments, in the presence of cadets, about the wife of one of our football coaches. This coach's wife overheard the comments and filed a complaint with the college."

As a result of the determination that he had counseled the cadet to falsify her application, Plaintiff Baird was removed from his duties with the Scottish Highlander Battalion and terminated by COMTek.

Plaintiff Baird alleges that he was harmed in several ways. First, he claims that COMTek violated the Uniformed Services Employment and Reemployment Rights Act ("USERRA") by terminating him in a fashion that discriminated against him for his deployment to active duty. Plaintiff Baird has since voluntarily dismissed COMTek from the case with prejudice, so this cause of action is no longer at issue and, therefore, COMTek is no longer a party.

Second, Plaintiff Baird alleges that LTC Smith and each of the PC Defendants intentionally interfered with his employment contract with COMTek by virtue of the May 22 Memorandum authored by LTC Smith. Plaintiff Baird contends that LTC Smith did not direct a proper investigation, and had some ulterior motive for recommending Plaintiff Baird's termination. Plaintiff Baird further contends that Dean Gillespie told LTC Smith about Plaintiff Baird's prior disciplinary incident with the intent of having Plaintiff Baird fired. He finally contends that the College is liable for these alleged acts because both LTC Smith and Dean Gillespie should be found to be agents of the College.

3

The PC Defendants respond, in part, that LTC Smith was not the agent of the College, that in any event LTC Smith's actions with respect to the investigation were proper and not actionable, and that Dean Gillespie could not have formed the intent to interfere with Plaintiff Baird's contract because Dean Gillespie was told, before he made any communications of any nature regarding Plaintiff Baird, that the decision to remove Plaintiff Baird had already been made.

Plaintiff Baird's third contention, lodged against LTC Smith and the College, is that he was defamed by the statements in the May 22 Memorandum regarding his involvement in the cadet's falsification of her application. Plaintiff Baird does not make a defamation claim against Dean Gillespie, and he contends that PC is liable only by virtue of its alleged vicarious liability for LTC Smith.

In response to this allegation, PC argues again that LTC Smith was not PC's agent, and in the alternative, that the May 22 Memorandum falls within the scope of a qualified privilege for communications within an organization regarding employment.

## III.   PROCEDURAL HISTORY

Plaintiff filed his Complaint on September 24, 2003. As noted above, the Complaint contained three causes of action: (1) against COMTek for violating USERRA; (2) against the PC Defendants and LTC Smith for interference with contractual relations; and (3) against the College and LTC Smith for defamation.

On November 19, 2003, the United States Attorney for the District of South Carolina certified that LTC Smith was acting within his scope of his employment as an employee of the United States at all times material to Plaintiff's action. Based on that Certification, on November 21, 2003 the United States filed a "Notice of Substitution of the United States of America," pursuant to the Westfall Act, 28 U.S.C. § 2679(d), seeking to be substituted as a party in this action for LTC Smith. Shortly thereafter, the Government filed a motion to dismiss, or in the alternative, for summary judgment, arguing that Plaintiff failed to follow the mandated procedures under the Federal Tort Claims Act for an action against the United States.

4

On January 21, 2004, Plaintiff Baird filed a memorandum asking this Court to review the U.S. Attorney's Westfall Certification.  Plaintiff Baird contended that the U.S. Attorney's certification was incorrect and accordingly that LTC Smith, and not the United States, is the proper party to this action.

On March 16, 2004, the PC Defendants filed their own motion to dismiss, arguing a variety of grounds including the proposition that granting of the motion to substitute the United States as a party and dismiss it from the case would necessitate dismissal as to the College as a matter of law, at least to the extent that Plaintiff sought to hold the College vicariously liable for the actions of LTC Smith.

All of the aforementioned motions were fully briefed, and the Court conducted an initial hearing on August 26, 2004.  At the conclusion of that hearing, the Court directed the parties to conduct discovery related to the Westfall certification issue.  It appears that this discovery was relatively comprehensive, involving both written discovery and eight depositions.

At the close of this discovery, all parties supplemented their earlier briefing, submitting a substantial number of documents and deposition excerpts.  In addition, the PC Defendants filed a motion for summary judgment, arguing that discovery revealed no material issues of disputed fact, and that they were entitled to judgment as a matter of law.  COMTek also filed a motion for summary judgment prior to being dismissed from the case.

The matter came before the Court for argument of all of the pending motions on June 20, 2005. The parties submitted additional documents for the record at this hearing.

## IV.    UNDISPUTED FACTS

The Court finds that there is no genuine issue as to the following facts:

Plaintiff Baird was an Army reservist.  Plaintiff Baird was at all relevant times an employee of Defendant COMTek.  Plaintiff Baird was not hired, employed, reviewed, or compensated by PC. Plaintiff Baird was assigned to the Scottish Highlander Battalion by virtue of a contract between the Army and COMTek for the supply of personnel.  PC was not a party to that contract.  Plaintiff Baird served as the Recruiting Operations Officer ("ROO") for the Scottish Highlander Battalion.  As such, he was responsible for the recruiting of students to contract with the ROTC and to serve in the Army

5

after their graduation.

Plaintiff Baird's work within the Scottish Highlander Battalion was overseen by LTC Smith. LTC Smith participated in performance reviews of Plaintiff. LTC Smith was and is an officer and employee of the United States Army. LTC Smith was not hired, employed, reviewed, or compensated by PC.[2] LTC Smith was assigned by the Army as the Professor of Military Science to the Scottish Highlander Battalion. LTC Smith's immediate supervisor is a U.S. Army Officer, Col. James Holloway.

The ROTC is established by statute and regulation as part of the Army. 10 U.S.C.A. §§ 2101 *et seq.*; 32 C.F.R. § 562.5. Its chain of command is entirely through the military.

The enrollment and "disenrollment" of cadets are Army matters. Host colleges – such as Presbyterian College – are not consulted regarding, or involved in, ROTC enrollment decisions. ROTC cadets are "contracted" to enlist in the United States Army, and are ultimately commissioned as Second Lieutenants in the Army.

As the ROO for the Scottish Highlander Battalion, Plaintiff Baird was primarily responsible for the recruiting and enrollment of the cadet at issue in this case. The cadet's initial recruiting and enrollment took place under Plaintiff Baird's authority and with his involvement.

The ROTC Human Resources Assistant for the Scottish Highlander Battalion, Cathy Whitman, noticed a discrepancy in the medical disclosures of the cadet in question. In particular, it was observed that in a form filled out after Plaintiff Baird had left the Battalion, the cadet acknowledged her eating disorder and prescribed use of antidepressant medication. On a prior form, the cadet had denied these same items. Ms. Whitman reported this discrepancy within the Battalion. An investigation was conducted by Major Dennis Wolf, the ROTC Battalion Executive Officer.

The Army determined that the cadet was medically ineligible to enroll in ROTC. The Army also determined that Plaintiff Baird had known of the cadet's medical issues, and had improperly counseled

---

[2] However, as mentioned hereinafter, LTC Smith did serve as an unpaid volunteer assistant coach for the women's basketball team at PC.

and encouraged the cadet to falsify her application by misstating her medical history.  The medical

forms in question were Department of Defense forms.  They were not prepared by or submitted to

Presbyterian College.  Because the Army concluded that Plaintiff Baird had knowingly counseled a

cadet to lie on an Army form, the Army decided to ask COMTek – pursuant to the contract between the

Army and COMTek – to remove Plaintiff Baird from the Scottish Highlander Battalion.

No PC officer or employee was involved in any way in the investigation that led to this

conclusion.  No PC officer or employee was even aware of the investigation prior to the May 1, 2003,

meeting described below.  No PC officer or employee took any action regarding the investigation or the

removal of Plaintiff Baird at any time after the May 1 meeting.

The investigation of Plaintiff Baird was governed by the contract between the Army and

COMTek.  The relevant portion of that contract provides as follows:

> C.5.10.3.  Upon receipt of ***allegations or other indications of misconduct*** or conduct
> that reflects negatively on the Army, the ROTC unit or the school or university
> involving contractor personnel, ***the government may conduct an informal inquiry or
> informal investigation*** into the matter.  Informal inquiries or investigations that ***tend to
> substantiate inappropriate conduct by contractor personnel will be forwarded to the
> contracting officer with a recommendation for immediate replacement*** of contractor
> personnel . . ..  Informal investigations need not comply with the requirements of Army
> Regulation 15-6 and they ***need not be referred to contractor personnel prior to the
> contracting officer's recommendation*** for replacement of such personnel . . ..

Contract Between Army and COMTek ¶ C.5.10.3 (emphasis added).

Both Maj. Wolf and LTC Smith testified that on April 23, 2003, (before the May 1 meeting

between LTC Smith and Dean Gillespie, and before the May 22 Memorandum), Col. Holloway (LTC

Smith's immediate superior) had directed LTC Smith to remove Plaintiff Baird from his position with

the Scottish Highlander Battalion.[3]  No PC officer or employee was involved in this conversation and

---

[3]  As discussed hereinafter, Plaintiff attempts to cast doubt on the testimony that LTC Smith was
ordered to remove Plaintiff Baird on April 23.  The Court concludes that there is insufficient
evidence that the decision to remove Plaintiff Baird was made at any other time, and hence no
dispute as to a material fact with respect to this point.  As is also discussed, however, even if there
were evidence that the decision was made later, that would not affect the ruling on these motions;
the critical and indisputable fact is that Dean Gillespie was *told* in the May 1 meeting that the
decision had already been made.

order. Nor is there any evidence PC had any right or ability to influence the Army's decision to request removal of Plaintiff Baird from the Scottish Highlander Battalion.

On April 28, 2003, LTC Smith and Col. Holloway engaged in an email exchange. In the course of that exchange, LTC Smith wrote to Col. Holloway:

> Sir, Spoke with Larry Rose [of COMTek] this morning. He will send John Baird a notification letter giving him the option of either resigning or being fired . . .. I hate this has had to come to this but it is the right thing to do. Larry told me he will take all necessary actions. We will continue to offer to help John's wife while he is deployed. Thanks for your help in getting this resolved so quickly.

LTC Smith made an appointment to see Dean Gillespie on May 1, 2003, – after this email discussing the decision to remove Plaintiff Baird. Dean Gillespie did not know the reason for the meeting in advance. At that meeting, LTC Smith informed Dean Gillespie that the decision had been made to remove Plaintiff from the Scottish Highlander Battalion. No officer or employee of PC had been consulted or informed regarding the matter in any way, prior to this May 1 conversation.

LTC Smith's sole purpose in requesting the meeting was to inform PC's Vice President for Academic Affairs of the decision as a matter of courtesy, because the underlying issue involved a student of PC. LTC Smith was not seeking any advice or consent from Dean Gillespie. There is no evidence that Dean Gillespie was told that a formal memorandum such as the May 22 Memorandum would later be drafted.

In response to being informed that Plaintiff Baird was to be removed, Dean Gillespie informed LTC Smith of a prior incident involving Plaintiff and a member of the Presbyterian College community. In that incident, which Plaintiff Baird admitted at the time,[4] Plaintiff Baird made offensive remarks about the sexual characteristics of the body of the wife of one of PC's football coaches. As a result of this, Plaintiff was reprimanded and required to apologize and to undergo remedial sexual harassment

---

[4] Plaintiff Baird has acknowledged in an affidavit to this Court that the incident occurred, stating "[t]hat incident involved some comments I made in the presence of the wife of a faculty member. I admitted my involvement in that incident . . .." Affidavit of John B. Baird dated April 29, 2004. In his deposition in this case, Plaintiff Baird testified that he has no current recollection of the particulars of the incident.

8

training.  Dean Gillespie provided this information to LTC Smith only after being told that the decision to remove Plaintiff Baird had already been made.

The formal mechanism by which the Army's decision was communicated to COMTek was the May 22 Memorandum.  The May 22 Memorandum was prepared on Department of Army letterhead.  The May 22 Memorandum was routed solely to and through Army personnel and a COMTek employee; it was not addressed or sent to any employee or officer of Presbyterian College.[5]

## V.    THE PC DEFENDANTS' MOTION TO DISMISS

The premise underlying Presbyterian College's motion to dismiss[6] can be simply stated: if this Court upholds the Westfall certification that LTC Smith was acting within the course and scope of his government employment at all times relevant to this action and dismisses the action against him, then Presbyterian College argues it cannot be held vicariously liable for any of LTC Smith's actions.

As is set forth in the accompanying Westfall Order, this Court has upheld the Westfall certification regarding LTC Smith, and has granted the motion of the United States to be substituted for LTC Smith and then dismissed the United States pursuant to the Federal Tort Claims Act.  The Court therefore turns to PC's argument that this dismissal of LTC Smith and the Government requires dismissal of PC as a matter of law, to the extent that Plaintiff Baird seeks to hold PC vicariously liable for the acts of LTC Smith.

PC argues that two distinct legal doctrines – one arising out of South Carolina tort law, the other out of federal principles of governmental immunity – both lead to this result.

PC relies first on the principle of South Carolina tort law that a party who would be only vicariously liable is not subject to liability where the principal actor is exonerated.  Jordan v. Payton,

---

[5]  As noted above, the May 22 Memorandum recites that Plaintiff Baird admitted this misconduct to LTC Smith.  Plaintiff Baird denies having made this admission, and denies that he was interviewed at all by LTC Smith in connection with this investigation.

[6]  The motion to dismiss, as filed, also sought dismissal of the interference with contractual relations claim against Dean Gillespie based on his own conduct.  Given the factual record developed since that filing, however, it makes more sense to address that claim in the context of the PC Defendants' motion for summary judgment, which is discussed below.

409 S.E.2d 793, 794 (S.C. Ct. App. 1991) (stating that a guardian could not be held vicariously liable where judgment against the minor was void), *citing* Johnson v. Atlantic Coast Line R. Co., 140 S.E. 443, 445 (S.C. 1927) ("When the master and the servant are sued together for the same act of negligence or willful tort, and the master's liability rests solely upon the servant's conduct, a verdict against the master alone is illogical and cannot stand."); Brown v. National Oil Co., 105 S.E.2d 81, 82 (S.C. 1958) ("It is well settled that where a principal and agent or master and servant are jointly sued and the only evidence of negligence relates to acts committed by the agent or servant and the verdict of the jury exonerates the latter, a verdict against the principal or master alone cannot stand").

Plaintiff Baird has not disputed that Jordan or the other cited cases are the law. Instead, he has suggested that LTC Smith could be argued to serve two masters, hence dual agency, and that PC as one of his masters could be liable even in the face of a finding that LTC Smith was carrying out his governmental office and so was entitled to be personally dismissed pursuant to the Westfall Act.[7] This argument misses the point of Jordan, however.  That case stands for the clear proposition that a defendant (like PC) whose liability is vicarious *cannot* be held liable in a case in which the primary actor cannot, for whatever reason, be held liable.  Where the law, or a factfinder, has concluded that the person who actually did an act is not liable for that act, it makes sense that a party who is liable only through the actions of that exonerated primary actor cannot be held liable.  Accordingly, under Jordan, the removal of LTC Smith from this case and the dismissal of the United States, means that Presbyterian College is also entitled to dismissal to the extent that Plaintiff seeks to hold the College vicariously liable for the actions of LTC Smith (*i.e.*, for the defamation claim, and for the intentional interference claim except to the extent it rests on the conduct of Dean Gillespie, which is addressed separately).

PC also argues, and the Court agrees, that the doctrine of derivative immunity leads to the same

---

[7] As discussed in connection with the motion for summary judgment, the record in this case contains no evidence that LTC Smith was in fact serving as the agent of Presbyterian College in any of the matters alleged in the Complaint.  Thus, even if there were a theoretical possibility that a dual agent for the United States and a private party might be entitled to the protection of the Westfall Act, while at the same time also having acted as agent for the private party, this is not such a case. The record reveals that LTC Smith was acting *only* for the Army with regard to the matters alleged in the Complaint.

result.  The Fourth Circuit has made it clear that the doctrine of derivative immunity extends sovereign immunity beyond the sovereign itself to private entities that are being sued for the actions of the immune sovereign.  In Butters v. Vance International, Inc., 225 F.3d 462 (4th Cir. 2000), the defendant was a private security company that had been retained to provide security to a member of the Saudi royal family.  The plaintiff, Ms. Butters, was a female security agent employed by the defendant.  When the defendant attempted to assign Ms. Butters to duty in the "command post," the Saudis objected on religious and political grounds.  Ms. Butters sued the defendant, her employer, for discrimination.

The Fourth Circuit upheld dismissal of the claim, concluding that the employer enjoyed "derivative immunity" arising out of the sovereign immunity of the Saudi government.  The court explained that private agents of the government are immune from suit to the same extent as the government itself where the private agent is "following the commands of" the government or "acting within the scope of" their duties for the government.  225 F.3d at 466.

The reasoning of Butters applies here.  This is not merely a case in which PC is alleged to have done some act at the direction of government.  Instead, Plaintiff Baird seeks to hold PC liable for actions that were actually taken by a government official.  If LTC Smith's actions are themselves entitled to sovereign immunity under the FTCA, a private entity being sued for those actions should certainly enjoy the same degree of immunity.

Plaintiff Baird argues that derivative immunity is not available because Butters should be interpreted to apply only to government contractors.  However, the point of derivative immunity generally, is to avoid "imped[ing] the significant governmental interest in the completion of its work." 225 F.3d at 466.  Accordingly, derivative immunity is not limited to a narrow class of contractors. "[C]ourts define the scope of sovereign immunity by the nature of the function being performed – not by the office or the position of the particular employee involved."  Id.  The governmental interests at issue here – military recruitment and preparedness – are central and critical government functions. Holding private host colleges like PC liable for Army conduct with respect to an ROTC unit could chill participation in the ROTC program – which plainly would "impede" the Army's interests in recruitment

11

and preparedness.

Beyond this, even if Plaintiff's narrow reading of <u>Butters</u> – to extend derivative immunity only to one in a contractual relation with the government – were correct, derivative immunity would still apply.  The statute and regulations establishing the ROTC program make clear that host colleges are in an arm's length contractual relationship with the federal government.  <u>See</u> 10 U.S.C. § 2102(b)(2) (referring to agreement between host institution and Secretary of Army); 32 C.F.R. § 562.5(b) (same).

The Court finds that PC cannot be held vicariously liable for LTC Smith's conduct, in light of the dismissal of LTC Smith and the Government.  The ROTC program at issue here is a program of the United States Army, established by an Act of Congress.  <u>See</u> 10 U.S.C.A. §§ 2101 *et seq.* (establishing and regulating ROTC).  LTC Smith is an active-duty Army officer who was in charge of the Scottish Highlander Battalion which included the ROTC Program at Presbyterian College.  All of the allegations related to LTC Smith's conduct relate to core military functions – recruiting, staffing, and discipline. The attempt to hold PC vicariously liable for LTC Smith's actions taken on behalf of the U.S. Army amounts to an attempt to litigate the propriety of these military decisions.  As the Fourth Circuit has noted, "it is well established in this circuit that 'when discretionary decisions are ones of professional military discretion, they are due the courts' highest deference.'"  <u>Hawes v. United States</u>, 409 F.3d 213, 220 (4th Cir. 2005), *quoting* <u>Minns v. United States</u>, 155 F.3d 445, 451 (4th Cir. 1998).

If LTC Smith cannot be held liable for the actions in question, it certainly makes no sense that PC could be held liable for those actions.  Indeed, it would be contrary to the deference due military decisions to conduct a trial to determine whether PC was liable for LTC Smith's military decisions, after finding pursuant to the Westfall Act that LTC Smith "was acting within the scope of his office or employment *at the time of the incident out of which the claim arose*."  28 U.S.C. § 2679(d)(1) (emphasis added).

Accordingly, both the South Carolina tort law principle of no vicarious liability for a primary actor with no liability, and the doctrine of derivative immunity, compel this Court to conclude that PC cannot be held vicariously liable for the conduct of LTC Smith.

## VI.     THE PC DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The PC Defendants also move for summary judgment.  Federal Rule of Civil Procedure 56(c)

"mandates the entry of summary judgment, after adequate time for discovery and upon motion, against

a party who fails to make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett,

477 U.S. 317, 322 (1986).  Summary judgment is proper only if no material facts are in dispute and the

moving party is "entitled to judgment as a matter of law."  See Fed. R. Civ. P. 56(c); Celotex, 477 U.S.

at 322.  See also Bouchat v. Baltimore Ravens Football Club, 346 F.3d 514, 522 (4th Cir. 2003)

("neither unsupported speculation, nor evidence that is merely colorable or not significantly probative

will suffice to defeat a motion for summary judgment"; party opposing summary judgment must submit

facts "showing that reasonable minds could differ on a material point" (internal quotations and citations

omitted)).

Substantial discovery has taken place in this case – including full depositions of all the

significant participants.  The material facts are clear and fully developed, and they demonstrate that the

PC Defendants are entitled to summary judgment.

### A)     PC Cannot Be Held Liable for LTC Smith's Conduct

Plaintiff Baird's first thrust against PC is a contention that LTC Smith served as PC's agent, and

thus that PC is liable for his conduct.  Besides the legal obstacles to this claim, discussed in the

preceding section, the Court finds that Plaintiff Baird has failed to present any record evidence that LTC

Smith was PC's agent with regard to any of the allegations in the Complaint.

Plaintiff Baird does not contend that LTC Smith was PC's employee, or that he served as PC's

actual agent with respect to Plaintiff Baird's claims.  The record would be clearly contrary to such a

contention.  LTC Smith was employed and paid only by the Army; he was not a PC employee.  Plaintiff

Baird, similarly, was employed by COMTek and overseen by COMTek and the Army.  Nor did PC

participate in or direct in any way the decision to remove Plaintiff Baird from the Scottish Highlander

Battalion.  Plaintiff Baird acknowledged in his deposition that the President of PC did not have the

power to alter the Army's decision to request Plaintiff Baird's removal. PC also has no involvement in or authority over the recruitment and enrollment of ROTC cadets; that is purely an Army matter, carried out by Army personnel using Army forms and protocols. Thus, there is no evidence that would support a finding that LTC Smith was the actual agent of PC with respect to the allegations of the Complaint.[8] See McHugh v. University of Vermont, 758 F. Supp. 945, 949 (D. Vt. 1991), (active duty members of the Department of the Army assigned to the ROTC program at the University of Vermont were employees of the United States government, and were therefore not agents of the University), *aff'd on other grounds*, 966 F.2d 67 (2d Cir. 1992); Texas A&M Univ. v. Bishop, 2005 WL 120058 (Tex. 2005) (university not liable for alleged negligence of theater director, even though university paid director and had hiring and firing power, because director was an independent contractor and not an employee of university).

Nor has Plaintiff explained how LTC Smith's conduct can be seen as furthering the interests of PC in any fashion. Indeed, in arguing that the Westfall certification should be vacated, and that LTC Smith should be found to have been outside the scope of his *Army* employment, Plaintiff Baird has suggested that LTC Smith was pursuing some personal vendetta against Plaintiff Baird. See Plaintiff's Supp. Mem. in Opposition to the United States' Notice of Substitution (Mar. 17, 2005), p. 20 (LTC Smith's alleged actions "speak more to Smith's unprofessionalism and personal animosity toward Baird, than to any legitimate concern he may have had regarding Baird's supposed poor values and the reflection they may have had on the Cadet Corp[s], the U.S. Army, *or Presbyterian*" (emphasis added)); see also Id., p. 5 ("it is apparent that [LTC Smith was] motivated by an independent purpose"). While there is no material evidence of such a private agenda, this argument by Plaintiff somewhat concedes

---

[8]  Plaintiff Baird seeks to make something of the facts that LTC Smith served as an unpaid volunteer assistant coach for the women's basketball team, and that he was provided access to a PC credit card. Neither of these facts have anything to do with the removal of Plaintiff, and so they will not support a finding that PC had control over LTC Smith in any fashion related to Plaintiff's removal. While one might imagine a case in which a volunteer assistant coach could be deemed to be speaking or acting for a college *with respect to his or her coaching duties*, this case simply has nothing to do with PC's women's basketball program.

14

that LTC Smith was not acting as PC's agent. If he was motivated by private concerns – or even by Army concerns[9] – he was not serving PC.

In the absence of evidence of actual control or agency, Plaintiff seeks to rely on the doctrine of "apparent authority" to hold PC responsible for LTC Smith's actions. The primary authority relied on by Plaintiff for this proposition demonstrates that the doctrine does not apply here. The South Carolina Court of Appeals recently discussed the doctrine of apparent authority in <u>Charleston, S.C. Registry for Golf & Tourism, Inc. v. Young Clement Rivers & Tisdale, LLP</u>, 598 S.E.2d 717, 721 (S.C. Ct. App. 2004) (emphasis added):

> The doctrine of apparent authority focuses on the ***principal's manifestation*** to a third party that the agent has certain authority. Concomitantly, the principal is bound by the acts of its agent when it has placed the agent in such a position that persons of ordinary prudence . . . are ***led to believe the agent has certain authority and they in turn deal with the agent based on that assumption***. Thus the concept of apparent authority depends upon ***manifestations by the principal to a third party and the reasonable belief by the third party that the agent is authorized to bind the principal***.

There are at least three reasons that the doctrine of apparent authority cannot be invoked to hold PC liable for LTC Smith's conduct: (1) PC never made a "manifestation" to Plaintiff Baird – or anyone else – that LTC Smith had authority *from PC* to investigate or terminate Plaintiff Baird; (2) Plaintiff Baird in fact *knew* that LTC Smith was employed by and acting for the Army, not PC; and (3) Plaintiff Baird did not *act* or *rely* on the basis of LTC Smith's supposed authority or alleged agency relationship.

First, there is no evidence that PC manifested to anyone that LTC Smith had any authority, apparent or otherwise, to act on its behalf regarding Plaintiff. The only "evidence" Plaintiff offers to show a manifestation by PC that LTC Smith had authority from PC is the fact that LTC Smith has an office on the PC campus.[10] Adopting a rule that "presence on campus" equals "agency" would not be

---

[9]  At oral argument, Plaintiff's counsel suggested that LTC Smith's motivation was to obtain "immediate help . . . in recruiting operations." Tr. of June 20, 2005 Hearing p. 101. While this would be a military motivation, not a personal one (and while there is no record evidence that removing Plaintiff Baird would in fact bring additional recruiting help), it brings Plaintiff no closer to a showing that LTC Smith was acting on behalf of PC.

[10]  Plaintiff also makes reference to statements by LTC Smith himself, but as Plaintiff's memorandum makes clear, statements by the alleged agent will not support a finding of apparent authority. <u>See</u> <u>Young Clement</u>, 598 S.E.2d at 722.

appropriate.  In fact, the ROTC program is located on a college campus (and the senior commissioned officer given the academic rank of "professor") because that is the requirement of the statute; it is the Army, and not PC, that decides that placement.  10 U.S.C.A. § 2102; see also 32 C.F.R. § 562.7(a)(4)(iv) (requiring a host institution to "[m]ake available for use by the Senior ROTC unit necessary and adequate classrooms, administrative offices, [and] office equipment . . . and to pay the costs of utilities and maintenance thereof").  It would be unreasonable to conclude simply from the location of LTC Smith's office that PC gave him some particular authority to deal with Plaintiff Baird.  See Young Clement, 598 S.E.2d at 722 (law firm not liable for alleged conduct of an associate attorney – despite his presence in the firm's office and use of the firm's letterhead – where the firm never represented that the lawyer was its agent with respect to the particular engagement at issue).

Second, Plaintiff Baird cannot successfully maintain that LTC Smith had "apparent authority" for the simple reason that  Plaintiff Baird *knew* the precise relationships among the parties.  He knew that he was employed and assigned by a third-party contractor without ever being interviewed by PC.  He knew that he was not reviewed, overseen, or paid by PC.  And he knew that LTC Smith was employed by the Army.  Under these circumstances, there can be no "apparent authority" because of Plaintiff Baird's knowledge of where actual authority lay.  RESTATEMENT (SECOND) AGENCY § 8 comment c ("Apparent authority exists only to the extent that it is reasonable for the third person dealing with the agent to believe that the agent is authorized.  Further, the third person must believe the agent to be authorized").  Here, Baird is in a position unlike another third person which gave him knowledge of the parties.  He is a Major in the United States Army Reserve, was employed by COMTek, and understood LTC Smith's role, position, and duties.  Baird is not an individual unfamiliar with the relationship of the parties.

This conclusion is reinforced by the clear fact that the events in question here relate solely to Army concerns, and not at all to the interests of the College.  At issue here is an Army decision, made by Army officers, to remove Plaintiff Baird from his Army position because he encouraged a potential cadet recruit to lie to the Army about her own fitness to serve in the Army.  The concerns of recruiting

16

and enrollment are plainly core Army functions.  The falsified form was a Department of Defense form, and the Army's Cadet Command Surgeon was asked to determine whether the cadet was medically qualified to serve.  Plaintiff Baird was assigned to the Scottish Highlander Battalion pursuant to a contract between the Army and COMTek, and he was overseen by Army personnel.  The May 22 Memorandum was not requested by, reviewed by, or routed to any PC employee.  It was purely an internal Army communication (with a copy to the Army's contractor, COMTek).  None of the matters at issue here had anything to do with any aspect of PC's business.  Under such circumstances, no reasonable person could believe that LTC Smith was acting for PC.  He plainly was acting for the U.S. Army.

Third, Plaintiff Baird did not act or rely on the basis of LTC Smith's supposed authority.  The doctrine of apparent authority applies only where the plaintiff has somehow relied on the supposed agency.  See Young Clement, 598 S.E.2d at 722 (apparent authority claim fails where "there is no evidence that [plaintiffs] relied, to their detriment, on any representation made by" alleged principal); McAllister v. Graham, 339 S.E.2d 154, 156 (S.C. Ct. App. 1986) (apparent authority does not apply to plaintiff's claim in two-car collision; in collision, plaintiff had "no reason to consider or rely on" other driver's agency).

Plaintiff Baird did not "rely on" the idea that LTC Smith was PC's agent.  Instead, Plaintiff Baird was simply terminated.  Indeed, he alleges that he was terminated without having been told he was under investigation.  The doctrine of apparent authority does not apply in this case.

Plaintiff's theory that LTC Smith was PC's agent has no factual or legal basis.  The PC Defendants are entitled to summary judgment on both causes of action, to the extent that they are alleged to be vicariously liable for LTC Smith's conduct.

### B)  In Any Event, LTC Smith's Actions Were Not Actionable

Even if Plaintiff could somehow prove that LTC Smith had acted as an agent of PC, PC would still be entitled to summary judgment for the simple reason that LTC Smith's conduct was not wrongful.  Accordingly, the following holdings provide an alternative basis for granting PC's motion for summary

judgment as to LTC Smith's conduct.

### 1. LTC Smith Did Not Interfere with Plaintiff's Contract with COMTek

A Plaintiff alleging tortious interference with contractual relations must be able to prove:  (1) the existence of a contract; (2) the defendant's knowledge of the contract; (3) intentional procurement of its breach; (4) absence of justification; and (5) damages.  Kinard v. Crosby, 433 S.E.2d 835 (S.C. 1993).  The actions by LTC Smith and the Army were plainly not improper interference, for the simple reason that they were prescribed by the contract between the Army and COMTek, pursuant to which Plaintiff Baird was assigned to the Scottish Highlander Battalion.  Actions under contractual right are justified, and so cannot be improper interference.

Plaintiff Baird was hired by COMTek and assigned to the ROTC unit at PC pursuant to the contract between the Army and COMTek.  Thus, Plaintiff Baird's own contract derives from, and is contingent upon, the COMTek/Army contract.  Conduct pursuant to the COMTek/Army contract could not "interfere" with Plaintiff Baird's contract with COMTek.

As noted above, the COMTek/Army contract deals expressly with the situation in which there is a suspicion of misconduct on the part of a COMTek employee.  Of particular relevance, the contract provides that investigations of contractor personnel "need not be referred to contractor personnel prior to the contracting officer's recommendation for replacement of such personnel."  Contract Between Army and COMTek ¶ C.5.10.3.

Other than his general disagreement with its conclusion, Plaintiff Baird's only concrete criticism of the investigation of his conduct is his claim that he was not interviewed as part of that investigation.[11]  However, the quoted provision of the very contract under which Plaintiff was assigned to the Scottish Highlander Battalion makes it clear that Plaintiff Baird had no entitlement to such an interview.

---

[11]  There is evidence that Plaintiff Baird was interviewed.  But the determination on this point is ultimately irrelevant, and so does not present an issue of material fact, because the COMTek/Army contract expressly provides that personnel such as Plaintiff need not be interviewed.  Beyond this, Plaintiff Baird speculates that LTC Smith must have had some ulterior motive for wanting to harm Plaintiff Baird.  There is, however, no record evidence of any such animus, and such pure speculation will not avert the entry of summary judgment.  Bouchat, 346 F.3d at 522.

Under South Carolina law, a party's good faith exercise of its rights under a contract with a second party will not give rise to a claim of tortious interference with contract by a third party, even if the exercise of contractual rights has some impact on the third party's contract with the second party. Southern Contracting v. H.C. Brown Constr. Co., 450 S.E.2d 602 (S.C. Ct. App. 1994); Webb v. Elrod, 418 S.E.2d 559 (S.C. Ct. App. 1992). Moreover, as the Southern Contracting decision explains, Plaintiff Baird "was not a party to [the COMTek/Army] contract and had no contractual right to require good faith and fair dealing . . .. Therefore, any inquiry into the manner or uniformity with which [the Army] chose to enforce its contract . . . is irrelevant." 450 S.E.2d at 605.

Because the Army had a clear contractual right to conduct the investigation of Plaintiff Baird as it did, and because it was LTC Smith's job to conduct such investigations, Plaintiff cannot satisfy his burden of showing a lack of justification in the decision to seek his removal. See Threlkeld v. Christoph, 312 S.E.2d 14, 15 (S.C. Ct. App. 1984) (plaintiff's supervisors acting within scope of their work for employer not liable for tortious interference with contract).

**2.  The May 22 Memorandum is Not Defamatory Because It Is Protected by a Qualified Privilege**

For very similar reasons, the May 22 Memorandum does not constitute defamation. LTC Smith submitted this Memorandum only to superior officers and supervisors of Plaintiff who had a legitimate interest in its subject matter. LTC Smith's actions followed the procedure laid out in the COMTek/Army contract and were carried out pursuant to the direct order of his superior officer. Accordingly, the May 22 Memorandum is protected by a qualified privilege, and Plaintiff has no defamation claim.

South Carolina, like most states, recognizes a qualified privilege, which defeats a defamation claim, in circumstances like this one. The qualified privilege arises "from the need for full and unrestricted communication between parties regarding a matter or matters in which they have an interest or duty." 20 S.C. JURISPRUDENCE, *Libel & Slander* § 54. In order to invoke the privilege, the defendant must show that the communication in question was "made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a duty, [and was] made to a

19

person having a corresponding interest or duty." Id. (quoting Conwell v. Spur Oil Co.,125 S.E.2d 270, 274-75 (S.C. 1962)).  The elements of the qualified privilege are thus "good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only." Id.

A plaintiff must prove "actual malice" in order to overcome the privilege.  In this context, actual malice means "the defendant acted with ill will toward the plaintiff or acted recklessly or wantonly, meaning with conscious indifference toward the plaintiff's rights." Murray v. Holnam, Inc., 542 S.E.2d 743, 750 (S.C. Ct. App. 2001).

It is clear to this Court that under South Carolina law, a qualified privilege would attach to the May 22 Memorandum.  The S.C. JURISPRUDENCE article on *Libel & Slander* identifies a number of contexts in which the qualified privilege can arise, including (1) common interest in subject matter; (2) character or fitness of an employee; (3) protection of interests of a third party; and (4) discharge of duty. 20 S.C. JURISPRUDENCE, *Libel & Slander §§ 55-58.*  The May 22 Memorandum is a classic example under each of these headings, any one of which is adequate to support the privilege.  See Bell v. Evening Post Publ. Co., 459 S.E.2d 315, 317 (S.C. Ct. App. 1995) (communication made in course of investigation of allegation of sexual harassment is protected by qualified privilege).  The May 22 Memorandum falls  within these qualified privilege descriptions.

The operation of this qualified  privilege is critical to the internal workings of every organization. This qualified privilege "arises from the necessity of full and unrestricted communication concerning a matter in which the parties have an interest."  Bell, 459 S.E.2d at 317 (*quoting* Prentiss v. Nationwide Mut. Ins. Co., 181 S.E.2d 325, 327 (S.C. 1971)).  South Carolina courts have "recognized a qualified privilege . . . when the occasion was a bona fide inquiry by the employer into alleged misconduct of the employee."  Wright v. Sparrow, 381 S.E.2d 503, 506-07 (S.C. Ct. App. 1989).

Here again, Plaintiff's claim of "actual malice" amounts to the complaint that the Army did not interview Plaintiff as part of its investigation of his conduct.  As noted above, the governing contract expressly provided that there was no right to such an interview.  Thus, the Army and LTC Smith

conducted themselves in accordance with the COMTek/Army Contract. The law recognizes that entities like the Army must be able to communicate internally, and with their contracting partners, in order to deal with internal problems like the one at issue here. All of the communications at issue here are within the spirit and letter of this privilege. Thus, even if the PC Defendants could be held liable for LTC Smith's conduct, the May 22 Memorandum falls within the qualified privilege, and there is no actionable conduct. For all of the foregoing reasons, the PC Defendants cannot be held liable for the actions of LTC Smith.

### C) **Dean Gillespie Did Not Interfere with Plaintiff's Contract with COMTek**

 The record is also clear that neither PC nor Dean Gillespie can have any liability for Dean Gillespie's single brief conversation with LTC Smith regarding this matter.

It is undisputed that the entire involvement of any PC officer or employee in the events alleged by Plaintiff is limited to the May 1, 2003, meeting between LTC Smith and Dean Gillespie. It is further undisputed that this meeting was requested by LTC Smith, that Dean Gillespie had no advance knowledge of the purpose of the meeting, and that at the meeting LTC Smith informed Dean Gillespie that the Army had already decided to remove Plaintiff from the Scottish Highlander Battalion. Only after he had been informed that this decision was already made did Dean Gillespie inform LTC Smith of the prior misconduct by Plaintiff, involving improper comments about the sexual characteristics of the body of a PC employee's spouse.

The critical point here is that the only information available to Dean Gillespie is that the decision to remove Plaintiff Baird had already been made by the Army. This means that Dean Gillespie cannot have had any intent to procure a breach of Plaintiff Baird's employment contract, for the simple reason that Dean Gillespie had been told the decision was already made. See Smith v. Citizens & Southern Nat'l Bank, 128 S.E.2d 112, 114 (S.C. 1962) (where alleged breach would have occurred in any event, there is no liability for interference with contract).

This conclusion is reinforced by the remainder of the record. Plaintiff Baird admits that he and Dean Gillespie had no material dealings with one another of any nature, and further admits that he has

no reason to believe Dean Gillespie would bear any ill will toward him. Moreover, the fact that Dean Gillespie provided this (true) information about Plaintiff Baird only when a meeting was requested by LTC Smith suggests strongly that Dean Gillespie was not on any sort of "campaign" against Plaintiff Baird. The evidence is such that a reasonable jury could not find Dean Gillespie had any intent to procure a breach of Plaintiff Baird's contract.

Thus, whether or not the Army's decision to remove Plaintiff Baird was, in fact, made before May 1, the fact that Dean Gillespie was *told* the decision had already been made is sufficient to dismiss the claim against him. His understanding that the decision was made means that he could not have had any intent to influence that decision, since it was already made. However, the Court also concludes from the record before it that the decision was made before May 1, which means that Dean Gillespie's comments had no causal impact on the decision. This is confirmed by the following testimony of LTC Smith:

> **Q.**  All right. And when you went to see Dean Gillespie were you going to ask for his input in the Army decision or were you going to report to him on what had been decided?
>
> **A.**  I was reporting to him what had been decided by Colonel Holloway.
>
> **Q.**  Okay. And what did you tell Dean Gillespie?
>
> **A.**  That Colonel Holloway, I had told him what had happened with Cadet **[redacted]**. And I did that because Cadet **[redacted]** was a student at Presbyterian College and he should know what had been going on with one of his students. And that Colonel Holloway had made the decision to initiate this action to terminate Major Baird.
>
> **Q.**  So to your understanding had the decision already been made on May 1st when you went to talk to Dean Gillespie?
>
> **A.**  Yes, sir.
>
> **Q.**  All right. So would it be correct to say that whatever Dean Gillespie told you did not affect the decision that was made regarding Major Baird?
>
> **A.**  Did not affect the decision made by Colonel Holloway.

22

(Smith Dep. p. 220 l. 10 – p. 221 l. 9).  Notably, Major Dennis Wolf also testified that the decision was made by Colonel Holloway before May 1.

Plaintiff suggests that there are "two versions" as to when the decision to terminate was made – one offered by LTC Smith and an inconsistent version from his superior, Col. Holloway.  However, Col. Holloway's testimony did not pinpoint the time of the decision in any fashion, and thus does not give rise to any dispute as to LTC Smith's testimony that the decision was already made.  To the contrary, Col. Holloway's testimony deals with the formal handling of the paperwork that implemented that decision, including the May 22 Memorandum.  This describes the Army channels that were followed, but not when the decision was made to follow those channels.  For this reason, the fact that the May 22 Memorandum is styled a "recommendation" is not sufficient evidence that the decision had not already been made within the Army to remove Plaintiff Baird; the Memorandum merely implements that decision.[12]

There is also clear documentary evidence that the decision was made before May 1, and that Col. Holloway was aware of this decision.  On April 28, LTC Smith sent Col. Holloway an email that read in part:

> Sir,
> Spoke with Larry Rose [of COMTek] this morning.  He will send John Baird a notification letter giving him the option of either resigning or being fired.  He will also send our temp hire ROO, CPT Rob Clapper, a permanent contract . . ..  I hate this has had to come to this but it is the right thing to do . . ..  We will continue to offer to help John's wife while he is deployed.

Thus, the clear weight of the evidence in the record reveals that the decision to remove Plaintiff was made before the May 1 conversation between Dean Gillespie and LTC Smith.  It follows that there was no causal link between Dean Gillespie's May 1 meeting with LTC Smith and the decision to

---

[12]  Although in his briefing on the PC Defendants' motions, Plaintiff Baird argues that the decision regarding him may not have been made until after May 1, he seems to take a different position in his briefing opposing substitution of the United States for LTC Smith.  There, Plaintiff appears to *argue* that the decision to remove him was made before May 1.  Plaintiff's brief states, "Thus it is clear [that] . . . the decision was made *before* an investigation was undertaken.  Thus, the conclusions of the investigation were mandated before it even began."  Plaintiff's Supp. Mem. in Opposition to the United States' Notice of Substitution (Mar. 17, 2005), p. 16.

remove Plaintiff Baird, and therefore no way to hold Dean Gillespie or PC liable for that decision. The decision was already made before Gillespie and PC learned of it.

However, the critical point bears repeating. Because Dean Gillespie was told that the decision had already been made, his only understanding was that his comments would not affect the previously made decision, which means in turn that he had no intent to procure a breach. Thus, even if there were a factual dispute as to the timing of the decision, it would not be material.

The PC Defendants did not participate in any way in the investigation of Plaintiff or the decision to remove him. They were informed of this decision in a brief meeting, which occurred after the decision was made. There is no evidence that they desired, procured, advocated, or even knew about the decision to remove Plaintiff. The PC Defendants are entitled to summary judgment on Plaintiff's claim against the PC Defendants for interference with contractual relations as it relates to Dean Gillespie's casual and minimal involvement in this matter.

**D)  Charitable Immunity**

South Carolina's charitable immunity statute provides for dismissal from tort actions of employees of charitable organizations, such as Dean Gillespie, unless the employee acted in a reckless, willful, or grossly negligent manner:

> A person sustaining an injury or dying by reason of the tortious act of commission or omission of an employee of a charitable organization, when the employee is acting within the scope of his employment, may recover in an action brought against the charitable organization only the actual damages he sustains in an amount not exceeding the limitations on liability imposed in the South Carolina Tort Claims Act in Chapter 78 of Title 15. An action against the charitable organization pursuant to this section constitutes a ***complete bar to any recovery*** by the claimant, by reason of the same subject matter, ***against the employee*** of the charitable organization whose act or omission gave rise to the claim unless it is alleged and proved in the action that the employee acted in a reckless, willful, or grossly negligent manner . . ..

S.C. Code Ann. § 33-56-180(a) (emphasis added). It is undisputed that Presbyterian College is a "charitable organization" for purposes of Section 33-56-180.

In light of the foregoing, it is clear that Dean Gillespie has not acted in a "reckless, willful, or grossly negligent manner," and thus he is also entitled to dismissal under the Charitable Immunity Act.

24

The undisputed facts that Dean Gillespie, in his first and only contact with the matter, was told that the decision to remove Plaintiff Baird had already been made, and that Dean Gillespie and Plaintiff Baird never had any material interaction with one another, leave no basis for concluding Dean Gillespie acted with heightened culpability.  Absent such proof, Dean Gillespie is individually entitled to dismissal under the South Carolina charitable immunity statute.

**VII.**    **CONCLUSION**

The United States Army determined that Plaintiff John Baird, in his role as an ROTC recruiting officer, had counseled a cadet recruit to lie to the Army on a medical application form.  As a result of this determination, the Army decided that Plaintiff Baird should be removed from his ROTC position. This was an Army decision, related solely to Army recruiting and readiness, made and carried out by Army personnel.  The record before the Court makes it clear that LTC Smith was acting for the Army, and not as the apparent or actual agent of PC, at all times relevant to this inquiry.  It is equally clear that Dean Gillespie had no intent to have any effect on the Army's decision to remove Plaintiff Baird, and did not in fact have such an effect.

For these reasons, and for the other reasons set forth in this Order, the motions of the PC Defendants to dismiss, and for summary judgment, are both **GRANTED**.

**AND IT IS SO ORDERED.**

 s/ R. Bryan Harwell
R. Bryan Harwell
United States District Judge

Florence, South Carolina
August 18, 2005

25